BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMANTANO (276666)
OANA CONSTANTIN (325226)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:   619/234-4599
manifold@whafh.com
byrd@whafh.com
tramantano@whafh.com
constantin@whafh.com

*Attorneys for Plaintiff Toddy Eddy*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

TODD EDDY, derivatively on behalf of
VOLTA, INC.,

                Plaintiff,

    v.

SCOTT MERCER, FRANCOIS P.
CHADWICK, CHRISTOPHER WENDEL,
ELI AHETO, VINCENT T. CUBBAGE,
MARTIN LAUBER, KATHERINE J.
SAVITT, BONITA C. STEWART, and JOHN
J. TOUGH,

                Defendants,

    and

VOLTA, INC.,

                Nominal Defendant.

Case No. _____

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Todd Eddy ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Volta, Inc. ("Volta" or the "Company"), against its members of the Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' (defined below) breach of fiduciary duties and violations of federal law.   These wrongs resulted in millions of dollars in damages to Volta's reputation, goodwill, and standing in the business community.   Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Volta, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of Volta against certain of its officers and members of the Company's Board for breach- of their fiduciary duties as set forth below.

2.     The Company focuses on creating an electric vehicle ("EV") charging network that capitalizes on and catalyzes the shift from gas to electric vehicles.

3.     Volta primarily owns, operates, and maintains EV charging stations and has expanded its network across the United States to include 2,264 chargers across 23 states and territories.

4.     In 2010, the Company's predecessor corporation was founded under the name

"Volta Industries, Inc." ("Legacy Volta").

5.     Legacy Volta operated as a private entity until it became public following a business merger (the "Transaction") with Tortoise Acquisition Corp. II ("Tortoise") pursuant to a business merger agreement dated February 7, 2021 (the "Merger Agreement").

6.     The Merger Agreement provided for, among other things, the distribution of restricted stock units ("RSUs") to Legacy Volta's founders, Defendants Scott Mercer ("Mercer") and Christopher Wendel ("Wendel") (the "Founder Incentive Adjustment Plan").

7.     Following the consummation of the Transaction on August 26, 2021, Volta distributed RSUs pursuant to the Merger Agreement to Defendants Mercer and Wendel.

8.     On November 10, 2021, the Company announced its financial results for the third fiscal quarter ended September 30, 2021 ("3Q 2021").  Volta announced that selling, general and administrative expenses were $29 million, resulting from a one-time expense related to non-cash stock-based compensation of $4.2 million, totaling a $43.1 million net loss for the three-month period.

9.     The truth started to emerge on March 3, 2022, when the Company revealed that the financial results it had released for 3Q 2021 were incorrect, and that Volta had improperly evaluated the grant date of certain RSUs.  After properly accounting the RSUs for 3Q 2021, the one-time expense related to non-cash stock-based compensation for 3Q 2021 was ***$26.7 million higher*** than previously reported, resulting in the net loss for 3Q 2021 of $69.8 million.

10.    Following this news, Volta's stock price fell $0.11 per share, from $4.12 per share at close on March 2, 2022 to $4.01 per share at close on March 3, 2022.

11.    The following day, Volta's stock price fell an additional $0.23 per share, from $4.01 per share at close on March 3, 2022 to $3.78 per share at close on March 4, 2022.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 2 -

12.     On March 21, 2022, the Company announced that it would be rescheduling its earnings release for the fourth quarter ended December 31, 2021 and the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), and would be filing an amendment to Volta's 3Q21 10-Q (the "Amended 10-Q").

13.     Following this news, Volta's stock price fell $0.38 per share, from $4.50 per share at close on March 18, 2022 to $4.12 per share at close on March 21, 2022.

14.     Meanwhile, the Company's stockholders were left unaware of Defendants Mercer's and Wendel's impending resignations resulting from the damage caused by Volta restating its 3Q 2021 financials.

15.     The truth fully emerged on March 28, 2022.  On that date, Defendants Mercer and Wendel announced their resignations from their positions as Chief Executive Officer ("CEO") and President, respectively, and as directors of the Company.

16.     Following this news, the Company's share price fell $0.76 per share, from $4.13 per share at close on March 25, 2022 to $3.37 per share at close on March 28, 2022.

17.     As set forth herein, the Individual Defendants (defined below) breached their fiduciary duties to Volta by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Volta's business, operations, and prospects.

18.     Among other things, the Individual Defendants willfully or recklessly made and/or caused Volta to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company failed to properly account for the grant date of RSUs issued in connection to the Transaction; (ii) as a result, the Company understated its net loss for 3Q 2021; (iii) there were material weaknesses in the Company's internal control over financial

reporting that caused material errors; (iv) as a result, the Company would restate its financial statements; (v) as a result, Defendants Mercer and Wendel would resign from Volta; (vi) as a result, the Company's financial results would be negatively impacted; and (vii) Volta failed to maintain internal controls.

19.     As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

20.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing Volta to fail to correct these false and misleading statements and omissions of material fact to the investing public.

21.     Moreover, the Individual Defendants caused the Company to fail to maintain adequate internal controls, in violation of their fiduciary duties.

22.     As a result of the foregoing, two securities fraud class actions have commenced against Volta, Defendant Mercer, and Defendant Francois P. Chadwick ("Chadwick"), the Company's Chief Financial Officer ("CFO"), captioned *Kampe v. Volta Inc.*, Case No. 3:22-cv-02055 ("N.D. Cal.") and *Alvarez v. Volta Inc.*, Case No. 3:22-cv-02730 ("N.D. Cal.") (together, the "Securities Class Action").   The Securities Class Action has exposed the Company to massive class-wide liability.

**JURISDICTION AND VENUE**

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a).

25.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

27.     This Court has personal jurisdiction over the Defendants, and venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because nominal defendant Volta is headquartered in San Francisco, California, and conducts business in this District.  All Individual Defendants have substantial and sufficient business contacts within the State of California because of their current or former roles within the Company.

## PARTIES

*Plaintiff*

28.     Plaintiff is, and has been at all relevant times, a shareholder of Volta.

*Nominal Defendant*

29.     Nominal Defendant Volta is incorporated under the laws of Delaware with its principal executive offices located at 155 De Haro Street, San Francisco, California 94103. Volta's common stock is traded on the NYSE under the ticker symbol "VLTA."

*Individual Defendants*

30.     Individual Defendant Mercer is co-founder of Legacy Volta and served as Volta's CEO and a member of the Board since 2010.  On March 28, 2022, Volta announced that Mercer resigned as CEO and director, but would serve as an "independent advisor" to the Board through March 31, 2023.  As set forth in the proxy statement filed by Volta with the SEC on June 13,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 5 -

2022 (the "2022 Proxy"), as of June 10, 2022, Mercer beneficially owned 15,563,284 shares of Volta's Class A common stock, representing 9.2% of the Company's total outstanding Class A common stock as of that date worth nearly $34.4 million.  For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Mercer received $179,423,048 in total compensation from Volta, including: (i) $437,500 in salary; (ii) $500,000 in bonuses; (iii) $178,402,500 in stock awards; and (iv) $83,048 in additional compensation.

31.     Individual Defendant Chadwick has served as Volta's CFO since April 2021.  On June 10, 2022, Volta announced that Chadwick tendered his resignation as CFO and would remain with the Company until August 22, 2022.  As set forth in the 2022 Proxy, as of June 10, 2022, Chadwick beneficially owned 189,613 shares of Volta's Class A common stock, worth approximately $419,044.   For 2021 Fiscal Year, Chadwick received $9,671,612 in total compensation from Volta, including: (i) $280,000 in salary; (ii) $400,000 in bonuses; (iii) $6,464,697 in stock awards; (iv) $2,515,000 in option awards; and (v) $11,915 in additional compensation.

32.     Individual Defendant Wendel is co-founder of Legacy Volta and served as Volta's President and member of the Board.  On March 28, 2022, Volta announced that Wendel resigned as President and director effectively immediately.  As set forth in the 2022 Proxy, as of June 10, 2022, Wendel beneficially owned 11,002,636 shares of Volta's Class A common stock, representing 6.6% of the Company's total outstanding Class A common stock as of that date worth approximately $24.3 million.  For the 2021 Fiscal Year, Wendel received $151,965,715 in total compensation from Volta, including: (i) $391,667 in salary; (ii) $450,000 in bonuses; (iii) $151,041,000 in stock awards; and (iv) $83,048 in additional compensation.

33.     Individual Defendant Eli Aheto ("Aheto") has served as a director of Volta since

August 2021.  Prior to that time, he served as a director of Legacy Volta since October 2016. Aheto is Chair of the Audit Committee.  As set forth in the 2022 Proxy, as of June 10, 2022, Aheto beneficially owned 253,623 shares of Volta's Class A common stock, worth approximately $560,506.  For the 2021 Fiscal Year, Aheto received $27,826 in total compensation from Volta.

34.     Individual Defendant Vincent Cubbage ("Cubbage") has served as Volta's Interim CEO since June 2022 and as a director of Volta since August 2021.  Cubbage served as CEO and Chairman of Tortoise from July 2020 until the completion of the Transaction. Cubbage is Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee.  As set forth in the 2022 Proxy, as of June 10, 2022, Cubbage beneficially owned 1,497,884 shares of Volta's Class A common stock, worth approximately $3.3 million. For the 2021 Fiscal Year, Cubbage received $27,826 in total compensation from Volta.

35.     Individual Defendant Martin Lauber ("Lauber") has served as a director of Volta since August 2021.  Prior to that time, he served as a director of Legacy Volta since June 2020. Lauber is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.  As set forth in the 2022 Proxy, as of June 10, 2022, Lauber beneficially owned 1,661,252 shares of Volta's Class A common stock, worth approximately $3.6 million. For the 2021 Fiscal Year, Lauber received $25,217 in total compensation from Volta.

36.     Individual Defendant Katherine J. Savitt ("Savitt") has served as a director of Volta since December 2018.  Savitt is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.  She has also served as Chairperson of the Board since June 12, 2022.  As set forth in the 2022 Proxy, as of June 10, 2022, Savitt beneficially owned 394,387 shares of Volta's Class A common stock, worth approximately

$871,595.  For the 2021 Fiscal Year, Savitt received $35,652 in total compensation from Volta.

37.     Individual Defendant Bonita C. Stewart ("Stewart") has served as a director of Volta since March 2021.  Stewart is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.  As set forth in the 2022 Proxy, as of June 10, 2022, Stewart beneficially owned 166,270 shares of Volta's Class A common stock, worth approximately $367,456.   For the 2021 Fiscal Year, Stewart received $25,217 in total compensation from Volta.

38.     Individual Defendant John J. Tough ("Tough") has served as a director of Volta since August 2021.  Prior to this time, he served as a director of Legacy Volta since May 2019. Tough is Chair of the Compensation Committee and is a member of the Audit Committee.  As set forth in the 2022 Proxy, as of June 10, 2022, Tough beneficially owned 12,813,274 shares of Volta's Class A common stock, representing 7.6% of the Company's total outstanding Class A common stock as of that date, worth approximately $28.3 million.  For the 2021 Fiscal Year, Tough received $29,565 in total compensation from Volta.

39.     The Defendants identified in paragraphs 30 through 38 are herein referred to as the "Individual Defendants," and, collectively, "Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

40.     By reason of their positions as officers and/or directors of Volta, and because of their ability to control the business and corporate affairs of Volta, the Individual Defendants owed Volta and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Volta in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Volta and its shareholders so as to benefit all shareholders

equally.

41.     Each director and officer of the Company owes to Volta and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

42.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Volta, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.     To discharge their duties, the officers and directors of Volta were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

44.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Volta, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition,

performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

46.    To discharge their duties, the officers and directors of Volta were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Volta were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Volta's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Volta conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Volta and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to

be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Volta's operations would comply with all applicable laws and Volta's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

47.     Each of the Individual Defendants further owed to Volta and the shareholders the duty of loyalty requiring that each favor Volta's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

48.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Volta and were at all times acting within the course and scope of such agency.

49.     Because of their advisory, executive, managerial, and directorial positions with Volta, each of the Individual Defendants had access to adverse, non-public information about the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 11 -

50.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Volta.

## <u>VOLTA'S CODE OF BUSINESS CONDUCT AND ETHICS</u>

51.     Volta's Code of Conduct explicitly applies to all officers, directors, and employees of the Company.

52.     As set forth in the Code of Conduct, "Volta . . . is committed to promoting high standards of honest and ethical business conduct and compliance with applicable laws, rules and regulations."

53.     Volta "adopted this Code of Conduct to set expectations and provide guidance applicable to all members ("directors") of the Company's Board and officers, employees, independent contractors and consultants of the Company[.]"

54.     As stated in the Code of Conduct:

The Company expects all of its directors, executive officers, managers and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to the Company, help foster a sense of commitment to this Code among its employees and foster a culture of fairness, honesty and accountability within the Company. The Company also expects such personnel to ensure that the Company's agents and contractors conform to the standards of this Code when working on the Company's behalf.

55.     According to the Code of Conduct, "All directors and employees are expected to comply the law while performing their duties to the Company."

56.     The Code further provides:

In order to make good decisions for the Company, directors and employees need to be aware of their own biases and make sure they counter them. Employees are expected to avoid actual or apparent conflicts of interest between their personal and professional relationships. For directors, this may include recusal from discussions of the Board when their participation could be perceived as creating such a conflict.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 12 -

A "conflict of interest" occurs when a personal interest interferes in any way (or even appears or could reasonably be expected to interfere) with the interests of the Company as a whole. Sometimes conflicts of interest arise when an employee takes some action or has some outside interest, duty, responsibility or obligation that conflicts with an interest of the Company or the employee's duty to the Company. A conflict of interest can arise when an employee takes actions or has interests that may make it difficult to perform the employee's duties objectively and effectively. Conflicts of interest can also arise when an employee or relative of an employee (including a family member of an employee) receives improper personal benefits as a result of the employee's position at the Company.

57.     Moreover, according to the Code of Conduct:

11. Financial Integrity; Public Reporting

The Company strives to maintain integrity of the Company's records and public disclosure. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

- no entry be made in the Company's books and records that is intentionally false or misleading;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;

- employees comply with the Company's system of internal controls and be held accountable for their entries;

- any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;

- employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 13 -

documents;

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the U.S. Securities and Exchange Commission (the "SEC") and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks. These controls and procedures include, but are not limited to, the following:

- no employee may take or authorize any action that would cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

- act honestly, ethically, and with integrity;

- comply with this Code;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 14 -

- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC;

- raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

- comply with the Company's disclosure controls and procedures and internal controls over financial reporting.

If an employee becomes aware that the Company's public disclosures are not complete, fair and accurate, or if an employee becomes aware of a transaction or development that the employee believes may require disclosure, the employee should report the matter immediately.

58.     With respect to "Senior Financial Employees," the Code of Conduct provides:

The Company's Finance Department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside of the Company. As such, the Board requires that the Chief Executive Officer and senior personnel in the Company's finance department adhere to the following ethical principles and accept the obligation to foster a culture throughout the Company as a whole that ensures the accurate and timely reporting of the Company's financial results and condition.

Because of this special role, the Company requires that the Chief Executive Officer, Chief Financial Officer, Vice President of Finance, Controller and any other persons performing similar functions ("Senior Financial Employees"):

- Act with honesty and integrity and use due care and diligence in performing their responsibilities to the Company. . . .

- Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in the Company's submissions to governmental agencies or in public statements.

- Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.

- Achieve responsible use of and control over all assets and resources

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 15 -

entrusted to each Senior Financial Employee.

**VOLTA'S AUDIT COMMITTEE CHARTER**

59.     Pursuant to Volta's Chart of the Audit Committee ("Audit Committee Charter"):

1.1 The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Volta Inc. (the "Company") shall be to:

1.1.1 Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;

1.1.2 Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications, independence and performance, and (iv) the Company's internal accounting and financial controls;

1.1.3 Provide the Board with the results of its monitoring and recommendations derived therefrom; and

1.1.4 Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

60.     As set forth in the Audit Committee Charter:

In addition to such other responsibilities as may be delegated to the Committee from time-to-time by the Board, the Committee shall:

3.1 Review on a continuing basis the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure; . . .

3.5 Review and discuss with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

3.6 Direct the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on

Form 10Q, using professional standards and procedures for conducting such reviews;

3.7 Conduct a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

3.8 Review before release the unaudited quarterly or annual operating results (or financial outlook or guidance) to be stated in the Company's quarterly earnings release with particular attention to any use of "pro forma" or "adjusted" non-GAAP information; . . .

3.11 Review any reports by management or internal auditors, if any, regarding the effectiveness of, or any deficiencies in, the design or operation of internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls and review before release the disclosure regarding the Company's system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure; . . .

3.22 Establish procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

3.23 Review and discuss with management, the independent auditor and the internal auditor, if any, the Company's major enterprise risk exposures and the steps management has taken to monitor and control such exposures, except as to those risks for which oversight has been assigned to other committees of the Board or retained by the Board[.]

## **SUBSTANTIVE ALLEGATIONS**

***Background***

61.     The Company focuses on creating an EV charging network that capitalizes on and catalyzes the shift from gas to electric vehicles.

62.     Volta primarily owns, operates, and maintains EV charging stations and has expanded its network across the United States to include 2,264 chargers across 23 states and territories.

63.     In 2010, Legacy Volta, the Company's predecessor corporation, was founded.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 17 -

64.     Legacy Volta operated as a private entity until it became public following the Transaction with Tortoise.

65.     On February 8, 2021, Tortoise filed a Form 8-K with the SEC, which announced the Transaction.

66.     The Merger Agreement was attached as Exhibit 2.1 to the Form 8-K, which set forth the terms of the Transaction, including the Founder Incentive Adjustment Plan.   The Founder Incentive Adjustment Plan would provide RSU awards to Defendants Mercer and Wendel, covering up to 10,500,000 shares of Volta common stock.

67.     The Transaction was consummated on August 26, 2021, and the post-Transaction entity was named Volta Inc.

***Defendants' False and Misleading Statements***

<u>August 2, 2021 Prospectus</u>

68.     On August 2, 2021, Tortoise filed a proxy statement/prospectus (the "Prospectus") with the SEC, signed by Defendant Cubbage, which solicited shareholder approval of the Transaction.

69.     With respect to the risks of owning new Volta common stock following the Transaction, the Prospectus stated that Defendants Mercer and Wendel will hold approximately 37.3% of the voting power of Volta, as they held all outstanding Class B common stock, which provided ten votes per share as opposed to one vote per share afforded by the Class A common stock.

70.     The Prospectus listed other risk factors, including the risks associated with retaining key employees.

71.     The Prospectus stated that Legacy Volta, as a growing company in a competitive

industry, relied heavily on key experienced employees to continue their growth and success.  The

failure to retain these key employees would not only hurt Legacy Volta's own prospects, but

could also benefit competitors.  The Prospectus provided:

> ***If Volta is unable to attract and retain key employees and hire qualified***
> ***management, technical, engineering and sales personnel, its ability to compete***
> ***and successfully grow its business would be harmed.***
>
> Volta's success depends on the continuing services of key employees, including
> members of its management team. The loss of any of these individuals could have
> a material adverse effect on Volta's business, financial condition and results of
> operations. Volta's success also depends, in part, on its continuing ability to
> identify, hire, attract, train and develop and retain highly qualified personnel. The
> inability to do so effectively would adversely affect its business. Competition for
> employees can be intense, particularly in the San Francisco Bay Area where Volta
> is headquartered, ad the ability to attract, hire and retain them depends on Volta's
> ability to provide competitive compensation. In addition, Volta competes for
> qualified personnel with its other competitors in the EV charging industry, who
> may seek to hire Volta's employees from time to time due to their industry
> expertise. Volta may not be able to attract, assimilate, develop or retain qualified
> personnel in the future, and failure to do so could adversely affect its business,
> including its growth prospects and ability to expand into new markets and
> geographies. . . .

(Emphasis in original).

72.     The Prospectus also highlighted Legacy Volta's material weaknesses in its

internal control over financial reporting.   The Prospectus provided that, following the

Transaction, Legacy Volta would become a public company and would be subject to an increase

in regulatory compliance and reporting requirements.   If it was unable to meet those new

standards, Volta could be subject to regulatory scrutiny and exposed to risk of regulatory action,

and investors could be harmed.  The Prospectus provided as follows:

> In connection with the preparation and audit of Volta's consolidated financial
> statements for the years ended December 31, 2020 and 2019, material weaknesses
> were identified in its internal control over financial reporting. A material
> weakness is a deficiency, or a combination of deficiencies, in internal control over
> financial reporting ***such that there is a reasonable possibility that a material***
> ***misstatement of Volta's annual or interim financial statements will not be***

*prevented or detected on a timely basis*. The following deficiencies in internal control over financial reporting were identified as material weaknesses:

• Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions and asset retirement obligations, commensurate with its accounting and reporting requirements.

• Volta did not maintain a sufficient complement of personnel to ensure appropriate segregation of duties to ensure that all journal entries and reconciliations were reviewed by an individual other than the preparer. Additionally, the Chief Financial Officer had inappropriate access rights in the general ledger system.

• Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately prevent, detect or correct material misstatements which resulted in a high volume of correcting journal entries recorded subsequent to year-end; and

• Volta did not design and maintain effective controls over certain information technology general controls for information systems that are relevant to the preparation of its consolidated financial statements. Specifically, Volta did not design and maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration.

(Emphasis added).

73.     The Prospectus further highlighted financial information for Legacy Volta.  The Prospectus stated:

Behavior and Commerce revenue increased by $2.4 million, or 212%, from March 31, 2020 to March 31, 2021, primarily due to large sales of media campaigns with several national brands in the three months ended March 31, 2021.

Network Development revenue decreased by $1.3 million, or 57%, from March 31, 2020 to March 31, 2021, primarily due to a decrease in installation service revenue of $0.7 million due to less construction activity occurring in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 and a decrease in infrastructure sales of $0.8 million due to no infrastructure sales occurring in the first quarter of 2021, offset by an increase in operations and maintenance revenue of $0.2 million due to an increase in the number of cumulative completed projects.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 20 -

Charging Network Operations revenue decreased by $0.5 million, or 100%, from March 31, 2020 to March 31, 2021, due to no regulatory credit sales occurring in the three months ended March 31, 2021.

Volta has earned $0.2 million in Network Intelligence revenue since it began generating Network Intelligence revenue in November 2020. . . .

*Selling, General and Administrative*

Selling, general and administrative expenses increased by $50.3 million, or 475%, for the three months ended March 31, 2021 as compared to the three months ended March 31, 2020. This was primarily driven by an increase in non-cash stock-based compensation of $45.3 million, driven primarily by the issuance of restricted stock awards to executive employees in the first quarter of 2021. This was also driven by an increase in legal, finance, tax and accounting services expense of $1.4 million, an increase in payroll costs for salaried employees of $1.7 million and an increase in research and development prototyping expense of $1.2 million related to charging technology improvement efforts. The payroll related cost increase was mainly driven by an increase in Volta's salaried employee headcount to 153 from 136 for the three months ended March 31, 2021 and 2020, respectively. . . .

*Net Loss*

Net Loss increased by $52.1 million, or 397%, from March 31, 2020 to March 31, 2021, primarily due to an increase of $1.1 million in cost of revenues, an increase of $51.1 million in operating expenses and an increase in interest expense of $0.6 million, partially offset by a $0.8 million increase in revenue.

74.     On August 26, 2021, the Company consummated the Transaction.

75.     On August 30, 2021, in connection with the Transaction, the Company filed statements of changes in beneficial ownership with the SEC, reflecting that Volta issued RSUs to Defendants Mercer and Wendel pursuant to the Founder Incentive Adjustment Plan.

<u>November 10, 2021 Earnings Call</u>

76.     On November 10, 2021, Volta held an earnings call to discuss with investors the Company's results for 3Q 2021.  During the earnings call, Defendant Chadwick stated:

Third quarter revenues were $8.5 million, compared to $4.8 million in the prior year period, largely attributable to strong growth within behavior and commerce.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 21 -

Behavior and commerce revenue grew to $7.4 million from 2.2 million in the prior year period, primarily due to increased sales of media campaigns, with several national brands. Cost of services was $5.4 million, compared to $4.6 million in the prior period, primarily due to increased station rent, driven by a larger aggregate number of active leases, additional advertising and media costs, and a rising network costs due to an increased charge for station data plans.

SG&A expenses were ***$29 million***, compared to $9 million in the prior year period. This was primarily due to planned growth initiatives that resulted in increased costs, including bonuses and commissions of $2.2 million, an additional insurance cost of $1.2 million, ***with one-time expenses related to non-cash stock-based compensation of $4.2 million*** and professional services primarily related to legal and finance fees of $3.2 million incurred related to the de-SPAC process.

***Net loss was $43.1 million***, compared to a loss of $14.5 million in the prior-year period and the EBITDA loss was 38.3 million, compared to a loss of $9.5 million in the prior year period.

In the quarter, Volta completed its business combination with Tortoise acquisition Corp II, resulting in proceeds of $350 million. The company had a cash and marketable securities balance of $331 million as of September 30, 2021. Shares outstanding as of September 30, 2021, were 161.9 million.

(Emphasis added).

November 12, 2021 Form 10-Q

77.     On November 12, 2021, Volta filed its quarterly report on Form 10-Q with the SEC for 3Q 2021 (the "3Q21 10-Q"), which was signed by Defendants Mercer and Chadwick. The 3Q21 10-Q confirmed the previously-released financial results for Volta.  The 3Q21 10-Q reported: (i) selling, general, and administrative costs and expenses of $28,963,000; (ii) total costs and expenses of $38,157,000; (iii) loss from operations of $29,667,000; (iv) loss before income taxes of $43,048,000; and (v) net loss of $43,048,000.

78.     With respect to compensation expense, the 3Q21 10-Q stated:

Compensation expense related to stock-based awards was recorded in selling, general and administrative in the condensed consolidated statements of operations and comprehensive loss for $4.6 million and $0.3 million for the three months ended September 30, 2021 and 2020, respectively, and $51.4 million and $0.8 million for the nine months ended September 30, 2021, and 2020 respectively.

79.     Moreover, the 3Q21 10-Q reiterated the material weaknesses regarding internal

control over financial reporting, providing:

> As disclosed in our prospectus filed pursuant to Rule 424(b)(3) of the Securities Act on September 29, 2021, in connection with the preparation of Volta's condensed consolidated financial statements as of and for the years ended December 31, 2020 and 2019, certain material weaknesses were identified in Volta's internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of Volta's interim or annual condensed consolidated financial statements will not be prevented or detected on a timely basis. The material weaknesses were as follows:
>
> • Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions and asset retirement obligations, commensurate with its accounting and reporting requirements.
>
> • Volta did not maintain a sufficient complement of personnel to ensure appropriate segregation of duties to ensure that all journal entries and reconciliations were reviewed by an individual other than the preparer. Additionally, the Chief Financial Officer had inappropriate access rights in the general ledger system.
>
> • Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately prevent, detect or correct material misstatements which resulted in a high volume of correcting journal entries recorded subsequent to year-end; and
>
> • Volta did not design and maintain effective controls over certain information technology general controls for information systems that are relevant to the preparation of its condensed consolidated financial statements. Specifically, Volta did not design and maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration.

80.     The 3Q21 10-Q further repeated the statement from the Prospectus regarding attracting and retaining key employees:

> *If Volta is unable to attract and retain key employees and hire qualified management, technical, engineering and sales personnel, its ability to compete and successfully grow its business would be harmed.*
>
> Volta's success depends on the continuing services of key employees, including members of its management team. The loss of any of these individuals could have

a material adverse effect on Volta's business, financial condition and results of operations. Volta's success also depends, in part, on its continuing ability to identify, hire, attract, train and develop and retain highly qualified personnel. The inability to do so effectively would adversely affect its business. Competition for employees can be intense, particularly in the San Francisco Bay Area where Volta is headquartered, and the ability to attract, hire and retain them depends on Volta's ability to provide competitive compensation. In addition, Volta competes for qualified personnel with its other competitors in the EV charging industry, Volta may not be able to attract, assimilate, develop or retain qualified personnel in the future, and failure to do so could adversely affect its business, including its growth prospects and ability to expand into new markets and geographies.

(Emphasis in original).

February 28, 2022 Form 8-K

81.     On February 28, 2022, the Company filed a Form 8-K with the SEC, signed by Defendant Chadwick, stating that the Audit Committee determined that the financial information reported in the 3Q21 10-Q contained inaccuracies.  The 8-K provided:

On February 24, 2022, the Audit Committee of the Board of Directors (the "Audit Committee") of Volta Inc. (the "Company" or "Volta") reached a determination that the Company's unaudited condensed consolidated financial statements and related disclosures included in its Quarterly Report on Form 10-Q for *the three and nine months ended September 30, 2021 [] contained an understatement of stock-based compensation resulting in an understatement of the Company's net loss. The Company improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs") to be November 8, 2021, resulting in an understatement of stock-based compensation in the Relevant Periods.* Upon further review, the Company determined the correct grant date under Audit Standard Codification 718 for these RSUs was August 26, 2021. The impact of correcting the accounting grant date is to shift the reporting periods in which stock-based compensation expense is recognized, and the Company expects that the preliminary, unaudited adjustments to stock-based compensation will increase net loss by approximately $26.7 million for the three and nine months ended September 30, 2021. . . .

The Company, in consultation with the Audit Committee, has determined that (i) the unaudited condensed consolidated financial statements and similar communications by the Company relating to the Relevant Period should no longer be relied upon and (ii) *it is appropriate to correct the error resulting in the understatements for the Relevant Periods by restating such unaudited condensed consolidated financial statements because the understatements are material to the Company's previously issued unaudited condensed consolidated financial statements.* The Company notes that:

• The adjustments do not impact revenue as presented on the consolidated statements of operations and comprehensive loss for the Relevant Period.

• The adjustments do not affect the total cash flows from operating, investing or financing activities as presented on the condensed consolidated statements of cash flows for the Relevant Period.

• While the understatements impact the timing of recognizing stock-based compensation expense, they do not impact the number of shares awarded, the timing of issuance of shares, or the aggregate amount of equity-based compensation expense to be recognized from the awards.

• The Company's management and the Audit Committee have determined the understatements were unintentional and were not the result of fraud or any other attempt to deceive.

*Preliminary Estimated Impact of Understatements*

The Company intends to restate its financial statements for the Relevant Periods, which will be addressed in an amendment to the Form 10-Q for the quarter ended September 30, 2021, to record the understatements. The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, ***resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $14.5 million and $69.7 million, respectively.***

(Emphasis added).

82. The statements identified above were materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading.

83. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (i) the Company failed to properly account for the grant date of RSUs issued in connection to the Transaction; (ii) accordingly, the Company understated its net loss for 3Q 2021; (iii) there were material weaknesses in the Company's internal control over financial reporting that caused material errors; (iv) as a result, the Company would restate its financial statements; (v) Defendants Mercer and Wendel would immediately resign following the material inaccuracies reported in Volta's financial statements; (vi) as a result, Volta would experience adverse impact to its financial results; and (vii) Volta failed to maintain internal controls.

84.     Due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

***The Truth Emerges***

<u>March 3, 2022 Form 8-K</u>

85.     On March 3, 2022, Volta filed an amended Form 8-K with the SEC, signed by Defendant Chadwick, stating that Volta had improperly assessed the grant date of specific RSUs and that, as a result, stock-based compensation and net loss were greater than previously reported.  The 8-K provided:

> The Company improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs") to be November 8, 2021, resulting in an understatement of stock-based compensation in the [three- and nine-months periods ending September 30, 2021]. Upon further review, the Company determined the correct grant date under Accounting Standards Codification ("ASC") 718 for these RSUs was August 26, 2021. The impact of correcting the accounting grant date is to shift the reporting periods in which stock-based compensation expense is recognized, and the Company expects that the preliminary, unaudited adjustments to stock-based compensation will increase net loss by approximately $26.7 million for the three and nine months ended September 30, 2021.
>
> The understatements during the Relevant Periods relate to stock-based compensation expense for certain of the Company's RSUs granted pursuant to the Company's Founder Incentive Plan, which approved in connection with the Company's business combination[.] . . .
>
> The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase in paid-in capital, resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million, respectively.

86.     Following this news, the Company's stock price fell $0.11 per share, from $4.12 per share at close on March 2, 2022 to $4.01 per share at close on March 3, 2022.

87.     Volta's stock price fell an additional $0.23 per share the following day, from $4.01 per share at close on March 3, 2022 to $3.78 per share at close on March 4, 2022.

March 21, 2022 Announcement

88.     On March 21, 2022, Volta was scheduled to release its fourth quarter and year-end financial results for the fiscal year 2021.  Instead, the Company issued a press release wherein it announced that it would be rescheduling its year-end conference call "once it completes the necessary review of its financial results," and would be filing an amendment to Volta's 3Q21 10-Q.

89.     Following this news, Volta's stock price fell $0.38 per share, from $4.50 per share at close on March 18, 2022 to $4.12 per share at close on March 21, 2022, while experiencing relatively high trading volume.

March 22, 2022 Amended Form 10-Q

90.     On March 22, 2022, Volta filed its Amended 10-Q with the SEC for the 3Q21 10-Q, signed by Defendants Mercer and Chadwick.  The Amended 10-Q stated that Volta:

> [I]mproperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs"), resulting in an understatement of the stock-based compensation for the three and nine months ended September 30, 2021. . . . The Company's management and the Audit Committee of the Company's Board of Directors determined that material weaknesses existed in the Company's internal control over financing reporting due to the lack of formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions, commensurate with its accounting and reporting requirements, and due to the lack of effective controls over certain information technology general controls for the information systems that are relevant to the preparation of its condensed consolidated financial statements, specifically program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration. These material weaknesses in the Company's internal control over financial reporting that resulted in the understatement of stock-based compensation.

91.     The Amended 10-Q restated the following: (i) selling, general and administrative costs were $55,664,000; (ii) total costs and expenses were $64,858,000; (iii) loss from operations

was $56,368,000; (iv) loss before income taxes was $69,749,000; and (v) net loss was $69,749,000.

92.     The Amended 10-Q reiterated the Company's material weaknesses in its internal control over financial reporting, stating:

> As discussed in the Explanatory Note to this Amendment No. 1 and in connection with the Restatement and of our unaudited condensed financial statements as of, and for the three and nine months ended, September 30, 2021, we determined that our previously reported weaknesses, namely that our review control over the completeness and accuracy of our stock-based compensation reporting and program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration did not operate effectively, resulting in a material error in the financial statements.

93.     While Volta ultimately disclosed information regarding its improperly accounted-for RSUs caused by the material weaknesses within the Company's internal controls over financial reporting, it failed to disclose that Defendants Mercer and Wendel would resign from the Company as a result of the damage caused by Volta restating its 3Q21 financials.

94.     On March 28, 2022, Volta filed a Form 8-K with the SEC, which announced that effective immediately, Defendant Wendel resigned from his position as President and director. Moreover, the Form 8-K provided that Defendant Mercer resigned from his position as CEO and director, but would continue in his role as CEO for a transition period while assisting the Board in searching for a new CEO.  Defendant Mercer would also serve as an "independent advisor" to the Board through March 31, 2023.

95.     The Form 8-K summarized settlement and release agreements (the "Separation Agreements") entered into in connection with Defendants Mercer's and Wendel's resignations. Pursuant to the Separation Agreements, Defendants Mercer and Wendel would continue to receive their respective base salaries for six months and continued healthcare coverage for up to

twelve months.  Defendant Mercer would also receive a consulting fee of $375,000 for his role as "independent advisor" to the Board.

96.     Following this news, Volta's share price fell $0.76 per share, from $4.13 per share at close on March 25, 2022 to $3.37 per share at close on March 28, 2022.

**Harm to the Company**

97.     As a direct and proximate result of the Individual Defendants' misconduct outlined herein, the Company has lost and expended, and will continue to lose and expend, millions of dollars.

98.     These costs include, inter alia: (i) legal fees in connection with the Securities Class Actions, including attorneys', accountants', experts', and investigators' fees; (ii) costs to implement measures to remedy the material weaknesses in Volta's internal controls over financial reporting; and (iii) substantial compensation and benefits paid to the Individual Defendants, who breached their fiduciary duties to the Company.

99.     As a direct and proximate result of the Individual Defendants' misconduct and breach of fiduciary duties, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a liar's discount regarding Volta's stock in the future.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

100.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

101.    Volta is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

102.    Plaintiff is a current shareholder of Volta and was a continuous shareholder of the

Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

103.    A pre-suit demand on the Board of Volta is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Aheto, Cubbage, Lauber, Savitt, Stewart, and Tough.

104.    Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants. A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that the current directors of Volta are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

105.    The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

106.    Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

107.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading

statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

108.    Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b) of the Exchange Act and Rule 10b-5

109.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

111.    The Individual Defendants, individually and in concert, directly or indirectly, willfully, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

112.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff in connection with his purchases of Volta common stock.

113.    The Individual Defendants acted with scienter because they: (i) knew that the

public documents and statements issued or disseminated in the name of Volta were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly, jointly, willfully, directly or indirectly, participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

114.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Volta, their control over, and/or receipt and/or modification of Volta's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Volta, participated in the fraudulent scheme alleged herein.

115.    As a result of the foregoing, the market price of Volta common stock was artificially inflated during the relevant time period.  In ignorance of the falsity of the statements, a reasonable investor would attach importance to such misrepresentations in determining how to proceed.   In particular, Plaintiff considered and relied upon the Individual Defendants' statements described above and/or the integrity of the market price of Volta common stock in purchasing Volta common stock at prices that were artificially inflated because of these false and misleading statements.  Consequently, Plaintiff suffered damages as a result.

116.    Likewise, as a result of the wrongful conduct alleged herein, the Company has also suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    The Individual Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

119.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

120.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

121.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

122.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs incurred in defending

itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

123.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

125.    Plaintiff on behalf of Volta has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Volta.

128.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Volta that were tied to

the performance or artificially inflated valuation of Volta, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

129.    Plaintiff, as a shareholder and a representative of Volta, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

130.    Plaintiff on behalf of Volta has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the Company.

133.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

134.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

135.    Plaintiff on behalf Volta has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 27, 2022

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: _/s/ Betsy C. Manifold_____
Betsy C. Manifold (182450)
Rachele R. Byrd (190634)
Alex J. Tramontano (276666)
Oana Constantin (325226)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramantano@whafh.com
constantin@whafh.com

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 36 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
(*pro hac vice forthcoming*)
Vincent A. Licata
(*pro hac vice forthcoming*)
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
tjm@rl-legal.com
vl@rl-legal.com

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# EXHIBIT A

DocuSign Envelope ID: DFA58181-9083-4DF5-A66F-EE41F3DC7864

## **VERIFICATION**

I, Todd Eddy, am a plaintiff in this action.  I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   7/14/2022

DocuSigned by:

*Todd Eddy*

22E8BFF81B3E4EF...

Todd Eddy